UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

RORY J. UHLER, et al.,

    Plaintiffs,

                                      Case No. 1:08-cv-457

vs.                                     Weber, J.
                                      Litkovitz, M.J.

OCWEN FEDERAL BANK, FSB,

    Defendant.

# REPORT AND RECOMMENDATION[1] THAT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. 45) BE GRANTED.

## I. Introduction

This matter is before the Court upon defendant's Motion for Summary Judgment (Doc. 45), plaintiffs' opposing memorandum (Doc. 48), and defendant's reply memorandum (Doc. 49). Plaintiffs Rory J. Uhler and Beth Dietz Uhler originally filed this action in the Butler County, Ohio Court of Common Pleas on April 4, 2008 (Doc. 2). Defendant Ocwen Federal Bank, FSB ("Ocwen") removed the action to this Court, alleging that the Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 and federal question jurisdiction pursuant to 28 U.S.C. § 1331 (Doc. 1). The Notice of Removal states that federal question jurisdiction exists because Ocwen allegedly failed to timely pay insurance premiums and real estate taxes from the escrow account

---

[1] Attached hereto is a NOTICE to the parties regarding objections to this Report and Recommendation.

for plaintiffs' mortgage, which is a duty imposed on a mortgage servicer by the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2605(g). The Notice alleges that plaintiffs' claim that Ocwen breached this duty therefore "depends on the existence, scope and breach of Ocwen's duty, if any, under RESPA." In addition, the Notice of Removal asserts that because Ocwen was a federally-chartered entity regulated by the Office of Thrift Supervision during at least part of the time for which plaintiffs claim their mortgage account was not properly credited, plaintiffs' claims regarding many fees and related issues are completely preempted to the extent they arose during that time period.

Plaintiffs' complaint makes the following allegations: Plaintiffs are husband and wife. Defendant Ocwen is a banking and mortgage institution doing business in Ohio. Ocwen purchased the mortgage on plaintiffs' home in September of 1998. Since purchasing the mortgage, Ocwen has engaged in a pattern of misleading and unfair practices which have caused plaintiffs to incur expenses, emotional distress, and serious damage to their credit and ability to obtain normal financing; Ocwen has harassed plaintiffs with threatening letters, falsely claiming they have made written research requests when they have not done so; Ocwen has repeatedly notified plaintiffs that it has not received their monthly mortgage payments, when in fact it has received the payments; Ocwen has failed to timely pay plaintiffs' homeowners insurance premiums and real estate taxes from their escrow account in violation of the terms of the mortgage; Ocwen falsely claimed that plaintiffs had filed for Chapter 13 bankruptcy when in fact they have never filed for any type of bankruptcy; Ocwen has threatened plaintiffs with foreclosure based on allegedly late payments dating back over a period of seven years, despite the fact that plaintiffs have timely made their payments; Ocwen has a pattern of notifying plaintiffs of defaults

2

with fluctuating arrearages without explaining the amounts, despite repeated demands by plaintiffs for an explanation and documentation; and Ocwen has a pattern of sending notices to plaintiffs postmarked seven to ten days after the notice date and sometimes postmarked after deadlines set forth in the notices for plaintiffs to satisfy various demands made by Ocwen. Plaintiffs claim that Ocwen's actions are in breach of the mortgage contract and that Ocwen has intended to cause them "loss, hardship and emotional distress."

## II. Findings of Fact

On May 27, 1998, plaintiffs executed a note ("Note") in favor of Source One Mortgage Services Corporation ("Source One") to finance the purchase of the real property located at 209 Country Club Drive, Oxford, Ohio 45056. Doc. 45, Affidavit of Nichelle Jones, Exh. A-1. Under the terms of the Note, plaintiffs borrowed $138,150.00 at an interest rate of 10.3%, and they were required to make a payment of $1,243.10 for principal and interest by the 27th day of each month for a 30-year period beginning June 27, 1998. *Id.*, ¶¶ 1-3. The Note provided that plaintiffs would pay a late charge if the Note Holder had not received the full amount of any monthly payment by the end of 15 days after the due date; they would be in default if they did not pay the full amount of each monthly payment on the date it was due; and if they were in default, the Note Holder could send them a written notice informing them that if they did not pay the overdue amount by a certain date, they could be required to pay immediately the full amount of unpaid principal and any interest owing on that amount. *Id.*, ¶ 6(A).

On the same date plaintiffs executed the Note, they executed a mortgage in favor of Source One which secured the Note ("Mortgage"). Jones Aff., Exh. A-2. The Mortgage required plaintiffs to pay a certain amount into an escrow account for taxes and insurance. It included the

following terms governing the escrow funds:

> Borrower shall pay to Lender on the day monthly payments are due under the Note . . . a sum ("Funds") for: (a) yearly taxes and assessments which may attain priority over this Security Instrument as a lien on the Property; . . . (c) yearly hazard or property insurance premiums . . . . These items are called "Escrow Items." . . . . Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.
>
> The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items . . . .
>
> . . . If the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify Borrower in writing, and, in such case Borrower shall pay to Lender the amount necessary to make up the deficiency. Borrower shall make up the deficiency in no more than twelve monthly payments, at Lender's sole discretion.

*Id.*, ¶ 2.

On September 15, 1998, Ocwen acquired the servicing rights to the Mortgage. Ocwen is neither the owner nor the holder of the Note or Mortgage. It serves as the attorney-in-fact for the holder of the Note.

On February 23, 2001, Rory Uhler sent a letter to Ocwen notifying it that plaintiffs' January 27, 2001 mortgage payment had not been credited to their account even though the check had cleared his account on February 1, 2001. Doc. 48, Exh. 3. He requested that Ocwen post the payment and remove the late charges and any penalties. Mr. Uhler attached a copy of a cancelled check dated January 23, 2001, made out to Ocwen for $1,342.15. Although plaintiffs claim that Ocwen ignored their inquiry, the record shows this is not accurate. Rather, Ocwen responded to Mr. Uhler's inquiry in a letter dated March 19, 2001. Jones Aff., ¶ 8; Exh. A-3. The letter

4

informed plaintiffs that as of January 1, 2001, their monthly payment had increased from $1,342.15 to $2,038.22; on February 13, 2001, funds in the amount of $1,342.15 had been received and applied to the suspense account until the remaining balance of the payment was received; and Ocwen was unable to remove the late charge in the amount of $62.12 for the January 2001 payment as requested because the charge had been transferred from the prior servicer. The letter also advised plaintiffs that copies of the escrow analysis and detailed transaction history were enclosed. The escrow analysis reflected yearly county taxes of $4,521.50, to be paid in semi-annual installments of $2,260.75, and an annual payment for hazard insurance in the amount of $469.00. The escrow analysis, which had been run on October 31, 2000, also reflected a negative starting balance of -$1,223.87 and a "required balance" of $3,326.96.

Rory Uhler sent Ocwen a letter dated April 12, 2001, both informing Ocwen that he had not received notice of an increase in the monthly mortgage payment until the March 19, 2001 letter and disputing the increase. Doc. 46, Exh. J. He referred to telephone conversations he had with Ocwen on April 6 and the morning of April 12, 2001, seeking information about the increase. He stated that during the April 12 conversation, Ocwen had confirmed that plaintiffs' taxes were $1,590.19 and their homeowners insurance was $469.13, and Ocwen had informed him that the new mortgage payment would be $1,590.19.[2] Mr. Uhler questioned the correctness of the new payment amount and requested written clarification of it. He advised Ocwen that based on the October 31, 2000 escrow analysis, he thought the perceived error stemmed from the incorrect listing of county taxes as $4,521.40, when they were actually approximately $1,500.00

---

[2]Mr. Uhler may have meant to say that Ocwen confirmed that plaintiffs' yearly taxes were $1,574.31 as this is the figure he quotes later in the letter.

5

annually and Ocwen had informed him earlier that day that they were $1,574.31 annually.

Around this same time, Ocwen sent plaintiffs an "Annual Escrow Account Disclosure Statement/Projections for Coming Year" dated April 11, 2001 ("Statement"). Jones Aff., Exh. A-4. The Statement reflected payments of $469.00 for hazard insurance and $867.34 and $706.97 for county taxes, as well as a cushion of $340.58 selected by the servicer. The Statement noted that the expected ending balance was -1,296.09 and the anticipated new starting balance was $825.47, meaning plaintiffs had a deficiency of -$1,296.09. The Statement advised plaintiffs that Ocwen had decided to collect the deficiency over 12 months by increasing the monthly escrow payment. The Statement concluded with the following paragraphs:

> After considering the deficiency, you still have a remaining shortage of $825.47. We have decided to collect it by spreading it over 12 months.
>
> Your monthly mortgage payment for the coming escrow year, beginning on the payment dated 02/01/2001, will be $1,590.19 of which $1,243.10 will be for principal and interest and $347.09 will go into your escrow account.

Subsequently, Ocwen sent Mr. Uhler a letter dated July 18, 2001. Doc. 46, Exh. K. The letter states that it is in response to Mr. Uhler's recent correspondence noting that Ocwen had increased his monthly mortgage payments and requesting an explanation for the increase. The letter reads as follows:

> As of this date, your monthly payments are $1,590.19. Each monthly payment consists of $1,243.10 for principal and interest, as well as $347.09 for escrow. Enclosed is a copy of an escrow analysis that was run on July 16, 1999. Please note that your total property tax disbursement was $720.65, which was not the full amount due for property taxes. As of April 11, 2001 Ocwen has run a new escrow analysis, which is also enclosed, that shows a shortage in your escrow account of $1,296.09. Ocwen has spread this shortage over a twelve month period bringing your total escrow payment to the $347.09 as stated above. Currently, your loan is next due for the May 27, 2001 payment.

Rory Uhler sent a letter to Moss, Codilis, Stawiarski, Mottis, Schneider & Prior, LLP, dated August 15, 2001, stating that he "firmly dispute[d]" the amount "allegedly owed to your client, 'OCWEN'." Doc. 48, Exh. 2. Mr. Uhler specifically disputed the amounts of $2,771.41 and $3,067.61 that he owed according to notices dated July 16, 2001 and August 2, 2001, respectively. Mr. Uhler stated that he had a fixed mortgage and he had been making timely mortgage payments. He expressed disbelief that there would be a delinquency of approximately $3,000.00 in the account given that plaintiffs' property taxes had increased by around only $300.00 in 2000 and their homeowners insurance rates had decreased by $27.00. Mr. Uhler advised the firm that he would continue to make timely payments and he sought a detailed explanation of the alleged debt.

Despite having received notice of the increase in the mortgage payment, plaintiffs continued to pay the original amount of $1,342.15 each month. Consequently, they received a series of letters/Notices of Default from Ocwen notifying them that Ocwen was attempting to collect a debt owed to Ocwen "as the owner or servicer of your home loan and mortgage." Doc. 48, Exhs. 4-9. The letters reflect widely varying amounts due on the Note on different dates as listed below:

```
Exh. 4:   11/12/03:   $12,140.98
Exh. 5:   07/12/04:   $15,241.22
Exh. 6:   07/11/06:   $22,727.99
Exh. 7:   11/12/07:   $13,381.32
Exh. 8:   04/14/08:   $10,677.63
Exh. 9:   05/12/08:   $11,080.55
```

Each letter/notice advised plaintiffs that unless they disputed the validity of the debt or any portion of it within 30 days of receipt of the letter, Ocwen would assume the debt to be valid.

Plaintiffs were advised that otherwise they could send a written request to the "Loan Resolution Consultant" within 30 days and Ocwen would send them verification of the debt. There is no documentation in the record showing that plaintiffs ever submitted a written request for verification of the debt in response to one of these letters/notices. Nor does the record include any other correspondence between Ocwen and plaintiffs subsequent to May 12, 2008.

### III. Motion for Summary Judgment

Ocwen[3] moves for summary judgment on what it purports to be the sole claim alleged in the complaint, which is a claim for breach of contract. Ocwen argues that it does not have a contractual relationship with plaintiffs because it is not the owner and holder of the Mortgage and the Note. Ocwen further argues that even assuming plaintiffs have a colorable claim against it for breach of contract, their claim fails as a matter of law because plaintiffs have not performed under the agreement, there is no evidence that Ocwen breached any contractual obligation to plaintiffs, and there is no evidence of a causal connection between an alleged breach and plaintiffs' claimed damages.

In response, plaintiffs mistakenly construe Ocwen's argument that it does not have a contractual relationship with them as an argument that Deutsche National Bank and Trust ("Deutsche"), the alleged current holder of the Note, is the real party-in-interest. Plaintiffs claim that Ocwen failed to give them notice of the transfer of the Note to Deutsche as required under

---

[3]Ocwen Loan Servicing, LLC designates itself as the moving party in the motion for summary judgment. It states that it is the successor-in-interest to Ocwen. However, no motion to substitute parties has been filed. The Court will therefore continue to treat Ocwen as the defendant.

RESPA.[4] Plaintiffs assert that as of 2005, Ocwen was still sending them correspondence without mention of other any entity. Plaintiffs allege it is also significant that they have made all of their monthly mortgage payments out to Ocwen and Ocwen has negotiated all of the payments. Plaintiffs also state that Ocwen did not raise the defense that there was no contractual relationship between the parties in its answer.

Plaintiffs further contend that they performed under their contract with Ocwen by making the same timely payment each month. They assert that Ocwen never gave them an explanation for the modified payments set forth in the March 19, 2001 and April 2001 notices and that Ocwen claimed they owed it widely varying amounts even though they continued to make the same monthly payment required in the original Mortgage. They claim they suffered damages because their attempt to refinance their 10.3% mortgage was denied, Beth Uhler was turned down for a credit card, and they have entered counseling as a result of Ocwen's actions. Finally, plaintiffs assert that Ocwen has not addressed its other actions which they have alleged in the complaint.

In its reply memorandum, Ocwen asserts that whether plaintiffs received notice of transfer of the Note to Deutsche is immaterial to the question of whether there is a contract between the parties before the Court. Ocwen asserts that plaintiffs did receive notice that servicing of their Mortgage loan was transferred to it in 1998. Ocwen asserts that plaintiffs have cited no authority for the proposition that a mortgage servicer owes any contractual obligation to a mortgagor. Ocwen further contends that plaintiffs cannot identify a breach of contract or a specific accounting error.

---

[4]This is the only reference to RESPA plaintiffs make either in their complaint or in their opposing memorandum. They do not assert any claims under RESPA in the complaint and do not seek damages under the statute.

9

## IV. Summary Judgment Standard

Fed. R. Civ. P. 56 allows summary judgment to secure a just and efficient determination of an action. The court may only grant summary judgment as a matter of law when the moving party has identified, as its basis for the motion, an absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

The party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253 (1968)). The evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 (1970)). However, a district court need not view the facts in the light most favorable to the nonmoving party if that party's version of events is "blatantly contradicted by the record, so that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The court is not to weigh the evidence and determine the truth of the matter but is to decide whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. There is no genuine issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Id.* (citing *Cities Serv.*, 391 U.S. at 288-289). If the evidence is merely colorable, *Dombrowski v. Eastland*, 387 U.S. 82, 84 (1967), or is not significantly probative, *Cities Serv.*, 391 U.S. at 290, judgment may be granted. *Anderson*, 477 U.S. at 249.

## V. Resolution

The Mortgage provides that it shall be governed by federal law and the law of the

10

jurisdiction in which the property is located. Jones Aff., Exh. A-2, ¶ 15. Ohio law therefore governs plaintiffs' breach of contract claim. To recover for a breach of contract under Ohio law, a plaintiff must establish the existence of a contract, the plaintiff's performance of his obligation, breach by the defendant, and damage or loss to the plaintiff. *Jarupan v. Hanna,* 173 Ohio App.3d 284, 294, 878 N.E.2d 66, 73 (2007) (citations omitted). To prove the defendant breached the contract, the plaintiff must show that the defendant "did not perform one or more of the terms of the contract." *Id.* (citation omitted).

As an initial matter, plaintiffs imply in their opposing memorandum that Ocwen is barred from arguing that the parties did not have a contractual relationship because Ocwen did not raise this defense in its answer. However, plaintiffs present no argument on this point and offer no authority for the proposition that the absence of a contractual relationship is an affirmative defense which is waived if not raised in the answer. Absent any such authority, the Court declines to find that plaintiffs are relieved of their burden to establish that there was a contract between the parties.

As evidence that they had a contract with Ocwen, plaintiffs point to the fact that they made their monthly payments out to Ocwen. They also assert that Ocwen was the only entity that corresponded with them regarding their payment obligations. Additionally, the Court notes that in the letters/Notices of Default which Ocwen sent to plaintiffs, Ocwen consistently informed them that the debt it was seeking to collect was owed to Ocwen. Doc. 48, Exhs. 4-9. These facts are sufficient to raise a question as to the nature of the parties' relationship and to preclude summary judgment on the ground that they did not have a contract.

Assuming plaintiffs had a contract with Ocwen, their breach of contract claim nonetheless

11

fails because they have not created an issue of fact as to whether Ocwen breached the terms of the contract, whether they were damaged as a result, and whether they performed under the contract. Ocwen appears to have made mistakes in connection with the servicing of the Mortgage, but there is no evidence that Ocwen committed a breach of the contract which resulted in the damages plaintiffs claim.

First, plaintiffs' account apparently was not properly credited with the January 2001 payment until after plaintiffs brought the error to Ocwen's attention. Doc. 48, Exh. 3. However, plaintiffs have not shown that they suffered damages as a result of this error. Although a late charge of $62.12 was added to their account, Ocwen apparently removed the charge on March 23, 2001. *See* Doc. 46, Exh. J; Jones Aff., Exh. A-6.

Second, Ocwen's March 19, 2001 letter informed plaintiffs that their monthly payment had increased from $1,342.15 to $2,038.22 as of January 1, 2001, based on an escrow analysis that showed inflated yearly property taxes and hazard insurance premiums of $4,990.50. Jones Aff., Exh. A-3. However, this error appears to have been harmless as Ocwen adjusted the monthly payment the following month, informing plaintiffs in April 2001 that their monthly mortgage payment for the coming escrow year, beginning as of the payment dated February 1, 2001, would be $1,590.19. Jones Aff., Exh. A-4. At this time, Ocwen designated a monthly sum of $347.09 for the escrow account. *Id.* The new sum was reasonable given that there was a deficiency in the account and plaintiffs were obligated to pay county taxes of approximately $1,574.00 per year and annual hazard insurance premiums of $469.00. *See* Jones Aff., Exh. A-4. In fact, plaintiffs have not shown that Ocwen erroneously calculated the new monthly payment or that there was anything untoward about its action. Ocwen responded to plaintiffs' inquiries about

the increase and twice provided an explanation and escrow statement or analysis to them. *Id.*, Exhs. A-4, A-5. Plaintiffs concede that they did not have any reason to doubt that there was a negative balance in the escrow account as shown in the April 2001 statement, and they knew their property taxes were increasing. *See* B. Uhler depo., pp. 14-15; R. Uhler depo., pp. 51, 60.

Third, Ocwen claimed in notices to plaintiffs that they owed widely fluctuating amounts as they fell further behind on their Mortgage. Plaintiffs have not shown that any of the amounts are erroneous, but assuming they are, plaintiffs never disputed or sought verification of them from Ocwen through the procedure outlined in the notices. Having failed to do so, plaintiffs cannot now be heard to complain that they have been damaged as a result of the alleged errors.

Finally, plaintiffs have not come forward with evidence to show that they fulfilled their contractual obligations under the Note and Mortgage. Plaintiffs allege that they did all that was required of them by continuing to pay the original amount they owed under the Mortgage. However, the terms of the Mortgage obligated plaintiffs to do more. The Mortgage provides that the Lender may notify the Borrower in writing if at any time the funds held by the Lender are not sufficient to cover the escrow items when due, in which case the Borrower is required to pay the Lender the amount necessary to make up the deficiency "in no more than twelve monthly payments, at Lender's sole discretion." Jones Aff., Exh. A-2, ¶ 2. Ocwen notified plaintiffs of the need to make up a deficiency in the Mortgage account and the decision to increase the payment to $1,590.19 in order to do so. Plaintiffs refused to pay the adjusted amount without justification. Plaintiffs should have been able to ascertain that the original escrow amount of $99.05 per month was insufficient to meet their tax and insurance obligations and fell far short of providing the

13

escrow cushion Ocwen had selected. Neither Ocwen's failure to initially credit the January 2001 payment, nor its advising plaintiffs in the March letter that their mortgage payment had increased substantially based on an inflated escrow amount, excuses plaintiffs' failure to pay the subsequently adjusted amount of $1,590.19 once they received notice of it. Nor do the wide variances in the arrearages claimed by Ocwen excuse plaintiffs' failure to pay the adjusted amount. Doc. 48, Exhs. 4-9. The first notice of arrearage plaintiffs reference is dated November 12, 2003, which is well over two years after they were advised of the new payment amount (Doc. 48, Exh. 4), and plaintiffs never disputed the amounts.

In sum, plaintiffs have not established that they suffered damages proximately resulting from Ocwen's alleged breach of its contractual obligations as opposed to as a consequence of their own actions. They have not produced evidence to show that they were justified in refusing to pay the adjusted monthly amount of $1,590.19 subsequent to the April 2001 notice. A reasonable jury therefore could not hold Ocwen liable for any damage to plaintiffs' credit rating resulting from an arrearage in their Mortgage account. Insofar as plaintiffs have suffered any emotional injury as a consequence of the actions Ocwen has taken with respect to their Mortgage account, they cannot recover those damages from Ocwen for the additional reason that Ohio law generally does not permit the recovery of emotional damages suffered as the result of a breach of contract. *See Brainard v. American Skandia Life Assur. Corp.*, 432 F.3d 655, 665 (6th Cir. 2005).

In addition to the specific actions by Ocwen which plaintiffs discuss in their opposing memorandum, plaintiffs claim that there are "the matters of the defendant's other actions stated in plaintiff's Complaint [which] have not been addressed." Doc. 48, p. 4. However, plaintiffs cannot carry their burden simply by referring to the allegations of the complaint. As the non-

movants, they have the affirmative duty to direct the Court's attention to the specific portions of the record upon which they rely to establish a genuine issue of material fact. *See In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001). They have not pointed to any evidence in the record to show that Ocwen took other actions which could be considered a breach of a contractual obligation it owed to plaintiffs.

## VI. Conclusion

For these reasons, the court hereby RECOMMENDS that defendant's motion for summary judgment be GRANTED, and that this matter be DISMISSED on the docket of the Court.

Date: 1/4/2011

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

RORY J. UHLER, et al.,
        Plaintiffs,

vs

OCWEN FEDERAL BANK, FSB,
        Defendant.

Civil Action No. 1:08-cv-457

Weber, J.
Litkovitz, M.J.

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

16